**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

|  |  |
|---|---|
| ROBERT POTTER, *et al.*,<br><br>        *Plaintiffs*,<br><br>   v.<br><br>JANUS INVESTMENT FUND, *et al.*,<br><br>        *Defendants*. | Civil Action No. 03-692 (DRH) |

**MEMORANDUM IN SUPPORT
OF THE JANUS DEFENDANTS' MOTION TO DISMISS**

Defendants Janus Investment Fund and Janus Capital Management LLC (the "Janus defendants") respectfully submit this memorandum in support of their motion to dismiss the Complaint of plaintiff Robert Potter for failure to state a claim on which relief can be granted.[1]

**I.      Introduction**

Potter sues on behalf of a putative class of investors in Janus Overseas Fund, a series of Janus Investment Fund that is comprised primarily of securities traded on foreign markets. The net asset value ("NAV") of shares in Janus Overseas Fund is calculated once daily using the prices of the securities comprising the fund. Under federal law, traded securities (including securities traded on foreign markets) must be priced at market value; if (and only if) market value is not "readily available," the fund may make an estimate of "fair value." Potter complains that the Janus defendants improperly set the NAV for shares in Janus Overseas Fund by allegedly relying on the market values of portfolio securities rather than engaging in "fair value"

1

pricing.  He claims that this alleged failure allowed arbitrageurs to profit from time-zone

differences between the domestic and foreign markets, allegedly resulting in a diminution of the

value of the fund.  But his claims fail as a matter of law, and the Complaint should be dismissed,

for three independent reasons.

*First*, this action may not be maintained by Potter under the law of Massachusetts, where

the fund is organized.  The sole injury alleged by Potter—the supposed diminution in the value

of the fund—is indirect.  Under Massachusetts law, such claims must be brought derivatively,

and must be preceded by a demand on the fund trustees.  Because Potter has failed to meet these

requirements of Massachusetts law, the Complaint should be dismissed.

*Second*, this action may not be maintained as a matter of federal law.  The sole source of

law governing the pricing of mutual fund shares is the federal Investment Company Act of 1940

("ICA") and regulations promulgated thereunder.  But no private right of action exists to enforce

the ICA provisions or regulations relating to NAV calculation.  Therefore, to the extent Potter

complains that the Janus defendants failed to adhere to the pricing policies mandated by federal

law, such claims cannot be maintained in a private civil action.  Moreover, to the extent Potter

contends that the Janus defendants were required under state law to use fair value pricing, such a

claim conflicts with the comprehensive federal framework governing the computation of NAV

and is preempted by federal law.  Accordingly, the Complaint should be dismissed.

*Third*, Potter's state-law claims (to the extent they may be maintained directly and are not

preempted by the ICA) are precluded by the Securities Litigation Uniform Standards Act of

---

[Footnote continued from previous page]

[1]  Potter's co-plaintiff, Dorothy Leuttinger, asserts no claims against the Janus defendants.

1998, 15 U.S.C. § 78bb ("SLUSA"), which requires class actions of the type Potter seeks to maintain to be brought exclusively under the federal securities laws.

## II.    BACKGROUND

### A.    The Allegations Of The Complaint

Potter alleges that he owns shares in Janus Overseas Fund, a mutual fund that invests primarily in securities traded outside the United States. Compl., ¶¶ 7, 11. According to the Complaint, fund shares "are sold to investors . . . at a price based upon the [NAV] per share plus applicable sales charges. Investors in shares may redeem their shares at the NAV of the shares less any redemption charges." *Id.*, ¶ 13. "Defendants set the fund share price (NAV) once every business day at the close of trading on the New York Stock Exchange at 4:00 p.m. Eastern Time." *Id.*, ¶ 15. Potter further explains that "[i]n valuing its underlying assets for purposes of setting the NAV, Defendants use the last trade price in the home market of each of the securities in its portfolio." *Id.*, ¶ 16.

Because of time-zone differences between New York and foreign markets, the Complaint asserts, "the closing prices of the foreign securities in the underlying portfolio may not reflect current market values at the time Defendants set their fund NAV," and "[t]he NAVs set by Defendants do not take into account on a daily basis any price relevant information that has become available in [the] interval, after the final prices for the underlying foreign securities have been posted but, prior to the setting of the NAVs." *Id.*, ¶¶ 17, 32. Potter contends that this creates an opportunity for so-called "market timers" to take advantage of the time zone differential between domestic and foreign markets by purchasing shares of the Overseas Fund at a discount or redeeming them at a premium. *See id.*, ¶¶ 33-35. The result, Potter contends, is that market timers reap "excess profits" and "vastly higher returns" that "come at the expense of fellow shareholders who are non-trading long term buy and hold investors." *Id.*, ¶¶ 37, 39.

3

### B.   The Federal Regulatory Scheme

Congress enacted the ICA out of an "immediate need for national legislation regulating investment companies." S. Rep. No. 76-1775, at 1 (1940).  One of the ways in which Congress sought to impose a national structure on investment companies was to set the manner in which mutual funds must calculate their NAV.  Under the ICA, open-end mutual funds must calculate their NAV using the *market value* of portfolio securities if the market value is "readily available." 15 U.S.C. § 80a-2(a)(41)(B)(i); 17 C.F.R. § 270.2a-4(a).  Significantly, the ICA does not require (or even permit) funds to ascertain the "fair value" of portfolio securities unless market quotations are *not* readily available:

> Portfolio securities with respect to which market quotations are readily available *shall* be valued at current market value, and other securities and assets shall be valued at fair value as determined in good faith by the board of directors of the registered company.

15 U.S.C. § 80a-2(a)(41)(B)(ii); 17 C.F.R. § 270.2a-4(a) (emphasis added).  The Securities and Exchange Commission ("SEC") staff has emphasized that when market quotations are readily available, "funds are not permitted to ignore these quotations and fair value price the securities," because to do so "would not be consistent with a fund's obligation under the 1940 Act and could result in an incorrect NAV." SEC Div. of Inv. Mgmt., *Letter to the ICI Regarding Valuation Issues*, Apr. 30, 2001, at 6 ("2001 ICI Letter").[2]

Regulations adopted under the ICA, in turn, require funds to compute their NAV at least once daily, at a specific time determined by the fund's board. 17 C.F.R. § 270.22c-1. "Typically, funds calculate their NAVs once each day at or near the close of the major U.S.

---

[2]  Copies of the 2001 ICI Letter and other authorities that may not be readily available to the Court are appended hereto.

securities exchanges and markets (usually 4:00 p.m., Eastern Time. . . .)." 2001 ICI Letter, at 1;

*see also The Investment Company Regulation Deskbook* § 5.1 (1997) (describing methodology

used to calculate NAV). With respect to valuing a portfolio security, the SEC has directed that

funds should use the last sales price on the exchange on which it is principally traded. Fed. Sec.

L. Rep. (CCH) ¶ 72,140 (Dec. 23, 1970). Because many foreign markets close before the NAVs

are set for domestic funds, the closing prices of foreign securities "may be as much as 12-15

hours old by the time of the funds' NAV calculation, and may not reflect the current market

values of those securities at that time." 2001 ICI Letter, at 1-2.

Nevertheless, federal law does *not* require mutual funds to employ "fair value" pricing

(*i.e.*, pricing based on a valuation estimate that may differ from the closing price of a security

trading on a foreign exchange) for all foreign securities in order to eliminate exposure to time

zone arbitrage. Instead, funds may be required to use fair value estimates to calculate NAV only

if the fund determines that a "significant event" has occurred after the close of a foreign market:

> [W]ith regard to a foreign security, a fund must evaluate whether a significant
> event (*i.e.*, an event that will affect the value of a portfolio security) has occurred
> after the foreign exchange or market has closed, but before the fund's NAV
> calculation. If the fund determines that a significant event has occurred since the
> closing of the foreign exchange or market, but before the fund's NAV calculation,
> then the closing price for that security would not be considered a "readily
> available" market quotation, and the fund must value the security pursuant to a
> fair value pricing methodology.

2001 ICI Letter, at 3. The SEC has never defined what constitutes a "significant event" that may

require the use of fair value pricing. *See Valuation and Liquidity Issues for Mutual Funds: 2002*

*Supplement*, INVESTMENT COMPANY INSTITUTE, Mar. 2002, at 9. Moreover, the SEC staff has

stressed that even the occurrence of a "significant event" does not require a fund to use a price

other than the most recent closing price of a portfolio's securities: "A determination that market

quotations are no longer 'readily available' would not preclude a fund's board from concluding

that the most recent closing market prices represent fair value." 2001 ICI Letter, at n.9.

## III.   ARGUMENT

### A.   Potter's Claims Are Precluded By Massachusetts Law

"The question whether a suit is derivative by nature or may be brought by a shareholder

in his own right is governed by the law of the state of incorporation." *Kennedy v. Venrock*

*Assocs.*, 348 F.3d 584, 589 (7th Cir. 2003); *see Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d

379, 382 (7th Cir. 1990) (recognizing that Illinois has adopted the "internal affairs" doctrine as

its choice-of-law principle in corporate governance).  Because defendant Janus Investment Fund,

of which Janus Overseas Fund is a series, is a Massachusetts business trust (*see* Compl. ¶ 3),

Massachusetts law governs the determination of whether Potter's claim must be brought

derivatively. *See Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 489 (N.D. Ill. 1999)

(applying Massachusetts law to shareholder suit against business trust formed in Massachusetts),

*aff'd*, 295 F.3d 738 (7th Cir. 2002), *cert. denied*, 537 U.S. 1088 (2002); *Lapidus v. Hecht*, 232

F.3d 679, 683 (9th Cir. 2000) (same).[3]

Under well-established law, "a shareholder may not directly bring claims that belong to

the corporation." *Green*, 186 F.R.D. at 489 (*citing Bessette v. Bessette*, 434 N.E.2d 206, 208

(Mass. 1982)).  In order to bring an individual action, a plaintiff "must be injured directly or

independently of the corporation," *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 351 (Del.

1988) (emphasis omitted), and not "merely as [an] owner[] of the corporate stock." *Jackson v.*

---

[3]  Defendant Janus Capital Management, the investment adviser to the Janus funds, is a
Delaware corporation. *See* Compl. ¶ 4.  Massachusetts courts look to Delaware law for
guidance on derivative actions. *See Houle v. Low*, 556 N.E.2d 51, 59 (Mass. 1990).

*Stuhlfire*, 547 N.E.2d 1146, 1148 (Mass. App. Ct. 1990); *see also Lapidus*, 232 F.3d at 683

(shareholder claim may be brought directly only if a plaintiff alleges an injury that is distinct

from other shareholders) (applying Massachusetts law); *Sarin v. Ochsner*, 721 N.E.2d 932, 934

(Mass. Ct. App. 2000). Massachusetts courts have long recognized that "[m]isconduct in dealing

with a corporation, or in the management of its affairs, can affect its members only through the

corporation itself," and "if [shareholders] deem themselves aggrieved . . . by the dealings of

others with it . . . they are bound to seek their remedy through corporate channels." *Dunphy v.

Traveler's Newspaper Ass'n*, 16 N.E. 426, 430-31 (Mass. 1888); *see also Aldo Cigal v. Leader

Dev. Corp.*, 557 N.E.2d 1119, 1123 (Mass. 1990); *Bartlett v. New York*, 109 N.E. 452, 453

(Mass. 1915).

Potter's Complaint is a textbook example of a derivative claim for which no direct action

may be maintained. Potter alleges that "[d]ue to the stale pricing utilized by Defendants, long

term buy and hold shareholders have incurred a dilution in the NAV of their shares and the

wealth represented by that diluted amount has been transferred to market timing traders."

Compl. ¶ 38. As the Complaint itself explains, this alleged injury is not unique to Potter (or any

other investor), but rather results only from an alleged diminution in value of the fund:

> When market timing traders are able to buy shares at a discount, *Defendants' fund
> assets suffer dilution* because the cash received by the fund for the shares
> purchased is less than the per share value of the underlying foreign securities
> because of the stale pricing utilized by Defendants. Likewise, when market
> timing traders are able to sell (redeem) shares at a premium, *Defendants' fund
> assets suffer dilution* because the cash paid out by the fund for the shares
> redeemed is more than the per share value of the underlying securities, again due
> to the stale pricing utilized by Defendants.

*Id.* (emphases added). Any claim for such dilution necessarily belongs to the fund itself, and *not*

to individual shareholders who were injured, if at all, only indirectly. *See Kramer*, 546 A.2d at

353 ("Any devaluation of stock is shared collectively by all the shareholders, rather than

7

independently by the plaintiff or any other individual shareholder"); *Litman v. Prudential-Bache Props., Inc.*, 611 A.2d 12, 15 (Del. Ch. 1992); *Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir. 1986); *Meyers v. Brinson Advisors, Inc.*, No. 02-CV-0222 (S.D. Ill. July 22, 2002) (Herndon, J.). Indeed, direct claims brought by mutual fund investors alleging dilution damages have "routinely" been dismissed because such claims are derivative in nature. *In re Merrill Lynch & Co.*, 272 F. Supp. 2d 243, 260 (S.D.N.Y. 2003).[4]

Because the claim that Potter advances is a derivative one, he lacks standing to prosecute a direct action against the Janus defendants and the Complaint should be dismissed. *See, e.g.*, *Lapidus*, 232 F.3d at 683, 684 (affirming dismissal for lack of standing where "the only injury to the shareholder is the indirect harm which consists of the diminution in the value of his or her shares"); *see also Green*, 186 F.R.D. at 490 (direct class-action claims dismissed because

---

[4] *See, e.g.*, *Lapidus*, 232 F.3d at 683-84 (mutual fund investors may not maintain a direct action where "the only injury to the shareholder is the indirect harm which consists of the diminution in the value of his or her shares"); *Kauffman v. The Dreyfus Fund, Inc.*, 434 F.2d 727, 732-22 (3d Cir. 1970) (denying direct action brought by mutual fund investor where the only harm to the plaintiff was the indirect harm of a reduction in the value of his shares); *In re Merrill Lynch*, 272 F. Supp. 2d at 261 (injuries "alleged to arise because the Fund's net asset value declined . . . *plainly* show that plaintiff's alleged injury was derivative, by virtue of her ownership of shares in the Fund") (emphasis added); *Green*, 186 F.R.D. at 490 (dismissing claims asserted by mutual fund investors as a direct class action because "[d]iminution in value of the common stock . . . is an injury to the Funds, and any harm to the plaintiffs as common shareholders is derivative in nature"); *King v. Douglass*, 973 F. Supp. 707, 724-725 (S.D. Tex. 1996) (claim premised on allegation that a "rights offering [would] reduce the NAV and the market value of the Fund's shares and dilute the value of existing shareholder's interests" held to be derivative because "[s]uch alleged acts [would] affect all shareholders equally, proportionate to each shareholder's ownership interest"). *Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002), is not to the contrary. The *Strougo* court recognized that claims involving the dilution of fund shares are derivative. *Id.* at 174. The claims that the *Strougo* court held could be maintained directly bear no relation to those asserted by Potter. *See id.* at 175-76.

"[d]iminution in value of the common stock . . . is an injury to the Funds, and any harm to the plaintiffs as common shareholders is derivative in nature").

Nor can Potter's Complaint be recharacterized as a derivative claim.  Not only did he fail to comply with the special pleading requirements of the state analogue to Federal Rule of Civil Procedure 23.1 (*see* 805 Ill. Comp. Stat. 5/7.80(b)), but a derivative action is precluded as a matter of substantive law:  In order to bring a derivative claim under Massachusetts law, Potter was required to make a demand on the fund before bringing suit, or explain in his complaint why such a demand was not made.  *Harhen v. Brown*, 730 N.E. 2d 859, 865 (Mass. 2000); *see generally Kamen v. Kemper*, 500 U.S. 90 (1991) (law of the state of incorporation determines whether demand is required).  Potter has made no such demand on Janus Overseas Fund or its trustees, nor has he explained in the Complaint the absence of a demand.  This failure requires dismissal of the Complaint.  *Jackson*, 547 N.E.2d at 1148.

### B.    Potter's Claims Are Precluded By The Investment Company Act

The gravamen of Potter's Complaint is that the Janus defendants breached "duties" supposedly owed to him and other investors by:

"i.    failing to know and implement applicable rules and regulations concerning the calculation of NAV;

"ii.    failing to properly evaluate on a daily basis whether a significant event affecting the value of Janus Overseas' portfolio of securities had occurred after the foreign trading markets for such securities had closed but before Defendants calculated NAV and share prices;

"iii.    failing to implement Janus Overseas' portfolio valuation and share pricing policies and procedures; and

"iv.    allowing portfolio valuation and share pricing policies and procedures which benefited market timing traders of Janus Overseas shares at the expense of long term shareholders."

Compl. ¶ 60 (Count II); *see also id.*, ¶ 56 (Count I).  The ICA, however, precludes Potter's

attempt to enforce these alleged "duties."

### 1.   There Is No Private Right Of Action To Enforce Section 22 Of The ICA Or Regulations Promulgated Thereunder

The first breach of "duty" alleged by Potter is that the Janus defendants "fail[ed] to know

and implement applicable rules and regulations concerning the calculation of NAV."  Compl.

¶ 60.  Although the Complaint does not specify those "rules and regulations," the context makes

clear that Potter is claiming that the Janus defendants failed to "know and implement" ICA Rules

2a-4 (which defines NAV for purposes of fund share pricing) and 22c-1 (which requires NAV

pricing).  *See* 17 C.F.R. §§ 270.2a-4 & 270.22c-1.

There is no basis for Potter's contention that the Janus defendants failed to *know* the

federal rules governing NAV calculation.  To the contrary, the Janus Overseas Fund prospectus

provides:

> A Fund's NAV is calculated at the close of the regular trading session of the
> NYSE (normally 4:00 p.m. New York time) each day that the NYSE is open. . . .
> Securities are valued at market value or, if a market quotation is not readily
> available, or if events or circumstances that may affect the value of portfolio
> securities are identified between the closing of their principal markets and the
> time the NAV is determined, at their fair value determined in good faith under
> procedures established by and under the supervision of the Trustees.

Janus Equity Funds Prospectus, at 66.[5]  The prospectus precisely tracks Rules 2a-4 and 22c-1 on

calculating NAV, as well as the SEC staff guidance on fair value pricing.

---

[5]  The Janus Equity Funds Prospectus applies to a number of series of Janus Investment Fund,
including Janus Overseas Fund.  Because Potter's description of the fund's pricing policies
necessarily refers to the prospectus (*see* Compl. ¶¶ 13-16), this Court may consider it without
converting this motion to dismiss into one for summary judgment.  Fed. R. Civ. P. 10(c); *see,
e.g., Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277 (11th Cir. 1999); *Lovelace v.
Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996).  Moreover, courts may take

[Footnote continued on next page]

Moreover, Potter's claim that the Janus defendants failed to *implement* federal regulations concerning NAV calculation cannot stand because no express private right of action exists to enforce the pricing requirements of the ICA. *See White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982, 986 (E.D. Wis. 2002). Indeed, with one exception not relevant here (*see* ICA § 36(b), 15 U.S.C. § 80a-35(b)), the ICA does not provide *any* express private right of action to enforce its provisions or the rules promulgated thereunder.

Nor may any private right of action to enforce Section 22 be implied based on the statutory scheme. Congressional intent is determinative in assessing whether a statute creates an implied right of action. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Absent explicit language creating a cause of action, there is a presumption that Congress did not intend to do so. That presumption is particularly strong where, as here, Congress has chosen to create an express private right of action for one part of a statute but not for another. In such cases, "Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omission of an explicit private right to enforce other sections was intentional." *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 433 (2d Cir. 2002) (holding that Congress did not intend a private right of action to exist under ICA §§ 26(f) and 27(i)).

Recognizing this presumption against implying a cause of action, and reflecting the Supreme Court's recent "retreat[] from [its] previous willingness to imply a cause of action where Congress has not provided one," *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 67 n.3 (2001), courts have consistently refused to recognize private rights of action under various provisions of the ICA, including Section 22. *White*, 237 F. Supp. 2d at 986-87 (no private right

---

[Footnote continued from previous page]
judicial notice of documents publicly filed with the SEC. *See Kramer v. Time Warner Inc.*,

[Footnote continued on next page]

of action under ICA §§ 22 or 34(b)); *see also In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 256 (S.D.N.Y. 2003) (no private right of action under ICA § 34(b)); *Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 581 (S.D.N.Y. 2001) (same); *meVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*, 260 F. Supp. 2d 616, 625 (S.D.N.Y. 2003) (no private right of action under ICA § 12(d)(1)(A)). This conclusion follows from the facts that the ICA's directives do not contain "rights-creating" language; Section 42 of the ICA provides for SEC enforcement of all provisions of the ICA, suggesting that Congress intended to preclude other methods of enforcement; and Congress provided a private right of action under Section 36(b) of the ICA, suggesting that its omission of an explicit private right to enforce other sections was intentional.

Moreover, where an enabling statute does not permit a private cause of action, no right exists to enforce the rules promulgated thereunder. *See Alexander*, 532 U.S. at 291 ("[I]t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself."); *Angelastro v. Prudential-Bache Secs., Inc.*, 764 F.2d 939, 947 (3d Cir. 1985). Because no private right of action exists under the provisions of the ICA pursuant to which the regulations governing NAV calculation were promulgated, private litigants cannot enforce those regulations in civil actions. The Complaint therefore fails to state a claim on which relief can be granted.

---

[Footnote continued from previous page]
   937 F.2d 767, 774 (2d Cir. 1991); Fed. R. Evid. 201.

### 2.     There Is No Private Right Of Action To Enforce SEC Staff Guidance

The second breach of "duty" alleged is "failing to properly evaluate on a daily basis whether a significant event affecting the value of Janus Overseas' portfolio of securities had occurred after the foreign trading markets for such securities had closed but before defendants calculated NAV and share prices." Compl. ¶ 60. This is an incomplete paraphrase of the guidance offered by the SEC staff in the 2001 ICI Letter concerning funds' obligations to implement fair value pricing upon the occurrence of a significant event.

The 2001 ICI Letter provides guidance from the SEC staff, but is not an authoritative pronouncement from the Commission itself. Although the Commission has cited the 2001 ICI Letter with apparent approval in a recent release (*see Compliance Programs of Investment Companies and Investment Advisers*, 68 Fed. Reg. 74,714, 74,718 (Dec. 24, 2003)), such policy statements are not entitled to the deference ordinarily afforded the regulations of federal agencies. *See, e.g., Clackamas Gastroenterology Assocs., P.C. v. Wells*, 123 S. Ct. 1673, 1680 n.9 (2003). Moreover, the Commission noted in that release only that "funds that fail to fair value their portfolio under [the circumstances described in the 2001 ICI Letter] *may* violate rule 22c-1." 68 Fed. Reg. at 74,718 (emphasis added). The SEC thus has not determined that failure to comply with the SEC staff guidance constitutes a violation of the NAV regulation.

In any event, there exists no private right of action to enforce the views of the SEC staff. The 2001 ICI Letter offers an interpretation of Rule 22c-1. Because there is no private right of action to enforce that regulation, it follows *a fortiori* that there is no private right of action to enforce the SEC staff's interpretive guidance on the rule. Indeed, even if the positions advanced in the 2001 ICI Letter are adopted by the Commission in a formal rulemaking in the future, there would be no private right of action for the reasons explained above.

### 3. There Is No Private Right Of Action To Enforce Compliance With Prospectus Policies

The third "breach of duty" allegation is the "fail[ure] to implement Janus Overseas' portfolio valuation and share pricing policies and procedures." *See* Compl. ¶ 60. But no private right of action exists under the ICA to compel a fund to comply with its prospectus disclosure. *White*, 237 F. Supp. 2d at 987; *cf. Dorchester Investors*, 134 F. Supp. 2d at 581 (finding no cause of action under ICA § 34(b) to challenge false statements in prospectus).

Moreover, the prospectus for the Janus Overseas Fund fully complies with the requirement of Section 22(d) of the ICA that mutual fund shares be offered to the public at a price stated in the prospectus. The SEC recently adopted *new* rules requiring investment advisers and funds to adopt policies regarding NAV calculation, including fair value pricing, but those rules do not become effective until February 5, 2004, with a compliance date of October 5, 2004. *See* 68 Fed. Reg. at 74,273. Potter cannot complain that the Janus defendants failed to comply with rules that were adopted after he filed his complaint, and in any event the new rules were adopted under Section 38 of the ICA, which does not authorize a private right of action.

### 4. The ICA Preempts Any Attempt To Require Fair Value Pricing Under State Law

The fourth, and final, "breach" alleged by Potter is that the Janus defendants "allow[ed] portfolio valuation and share pricing policies and procedures which benefited market timing traders of Janus Overseas' shares at the expense of long term shareholders." Compl. ¶ 60. To the extent that this allegation simply restates the assertion that the Janus defendants failed to comply with the requirements of federal law (namely, the ICA, SEC rules and staff guidance, or the prospectus policies), it fails for the reasons set forth above.

Potter cannot save these fatally flawed claims by attempting to impose on the Janus defendants a *state-law* obligation to implement fair value pricing. Any such obligation would

14

conflict with the federal framework that Congress and the SEC constructed regulating the

calculation of NAV. *Burks v. Lasker*, 441 U.S. 471, 480 (1979) (court must consider whether

state rule is "consistent with the policy of the ICA"); *see generally Hines v. Davidowitz*, 312 U.S.

52, 67 (1941) (state law claims are preempted where state law would "stand[] as an obstacle to

the accomplishment and execution of the full purposes and objectives of Congress"); *Capital

Cities Cable Inc. v. Crisp*, 467 U.S. 691, 699 (1984) ("Federal regulations have no less pre-

emptive effect than federal statutes") (internal citations omitted). Indeed, the SEC has so

comprehensively and exclusively regulated NAV calculation that the federal regulatory scheme

occupies the field in this area and precludes any intrusion under state law.

Congress vested the SEC with "broad regulatory authority over the business practices of

investment companies," *United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 704-05

(1975), including the authority to "make rules and regulations" governing the pricing of

investment company shares. 15 U.S.C. § 80a-22(c). The SEC has exercised that authority. For

example, Rule 2a-4 requires that "[p]ortfolio securities with respect to which market quotations

are readily available shall be valued at current market value . . . ." 17 C.F.R. § 270.2a-4(a)(1).

In addition, as described above, Rule 22c-1 requires investment companies to use forward

pricing to value their shares, and to compute current NAV no less frequently than once daily at a

time specified by the board of directors. 17 C.F.R. §§ 270.22c-1(a)-(b). These regulations bind

all investment companies and supersede all conflicting rules. 15 U.S.C. § 80a-22(c).

Significantly, the SEC itself has indicated that funds invested in foreign securities may

use foreign market closing prices to calculate the NAV of their funds, notwithstanding the time

differential between the closing of the foreign markets and the calculation of the NAV. More

than two decades ago, the SEC staff explained that "if the foreign exchange on which a portfolio

security is principally traded is closed at the time a fund computes its current net asset value,

then the fund may use the previous closing price on the foreign exchange to calculate the value

of the security, except when an event has occurred since the time the value was established that

is likely to have resulted in a change in such value." *Putnam Int'l Equities Fund*, Fed. Sec. L.

Rep. (CCH) ¶ 76,816 (SEC No-Action Letter Feb. 23, 1981). And the SEC itself has noted that

"funds appear to have relied on a long-standing position of the Commission's staff that a fund

may (*but is not required to*) value portfolio securities traded on a foreign exchange using fair

value, rather than the closing price of the securities on the exchange, when an event occurs after

the close of the exchange that is likely to have changed the value of the securities." *Registration*

*Form Used by Open-End Management Investment Companies*, 63 Fed. Reg. 13,915, 13,933

(Mar. 23, 1998) (citing *Putnam* no-action letter) (emphasis added).

Applying state law to impose obligations regarding fair value pricing would interfere

with the carefully constructed federal regulatory framework that currently governs calculation of

NAV of mutual fund shares. Under federal law, the Janus defendants are *prohibited* from using

fair value pricing unless market quotations are not "readily available." To the extent Potter

claims that the Janus defendants were required to use fair value pricing in other circumstances,

his state-law-based claims, which attempt to force the Janus defendants to do something they are

not required or even permitted to do under federal law, therefore are preempted. And to the

extent Potter claims that the Janus defendants failed to adhere to the requirements of federal law,

the structure of the ICA precludes the maintenance of claims under state law that are not

cognizable under federal law. *Cf. D'Alessio v. New York Stock Exchange*, 258 F.3d 93, 103 (2d

Cir. 2001) (right to enforce duties entrusted to SEC is "exclusively determined by federal law").

The decision in *Guice v. Charles Schwab & Co.*, 89 N.Y.2d 31 (1996), reinforces this conclusion. Plaintiffs in *Guice* (and in a series of other similar cases) alleged that the Defendant broker-dealer breached state-law fiduciary duties by taking so-called "order flow payments," or accepting remuneration for routing transactions to specified wholesale broker-dealers or market makers. *See Guice*, 89 N.Y.2d at 37. The court found plaintiffs' claims preempted because differing standards under state law would disrupt the uniform national scheme established by SEC regulations. *Id.* at 46. The court concluded that "[i]t is unlikely—to say the least—that Congress intended to establish such a chaotic regulatory structure," and refused to permit plaintiffs to pursue their claims under state law. *Id.* at 47 (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497 (1987)); *see also, e.g., Shulick v. PaineWebber, Inc.*, 722 A.2d 148 (Pa. 1998); *Orman v. Charles Schwab & Co.*, 688 N.E.2d 620 (Ill. 1997); *Dahl v. Charles Schwab & Co.*, 545 N.W.2d 918 (Minn. 1996).

Here, as in the "order flow" cases, allowing civil actions challenging the manner in which NAV is calculated would "adversely affect[] the ability of a Federal administrative agency to regulate comprehensively and with uniformity in accordance with the objectives of Congress . . . ." *Guice*, 89 N.Y.2d at 47. Explaining the "immediate need for national legislation regulating investment companies" (*see* S. Rep. No. 76-1775, at 1), Congress stated in the ICA that "investment companies are affected with a national public interest" because their activities "extend[] over many States," making "difficult, if not impossible, effective State regulation of such companies in the interest of investors." 15 U.S.C. § 80a-1(a)(5). Permitting a challenge to the valuation of NAV on a state law theory would thwart Congress's stated intent for national regulation of investment companies, and could have disastrous and disruptive consequences.

Finally, allowing Potter's common-law suit to proceed under a state-law theory would

17

"'interfere[] with the methods by which the federal statute was designed to reach [its] goal.'"

*Guice*, 89 N.Y.2d at 48 (quoting *Ouellette*, 479 U.S. at 494). Congress quite clearly intended for

the SEC—not state legislatures or state courts—to promulgate regulations to create "binding"

rules regarding the pricing of mutual fund securities. Indeed, both Congress and the SEC are

currently considering proposals to amend the rules governing the calculation of NAV, including

the circumstances under which fair value pricing should be used and what a fund must disclose

with regard to its calculation of NAV and use of fair value pricing. *See* Mutual Funds Integrity

and Fee Transparency Act, H.R. 2420, 108th Cong., § 204 (2003); Mutual Fund Investor

Confidence Restoration Act, S. 1971, 108th Cong., § 304 (2003); *Disclosure Regarding Market*

*Timing and Selective Disclosure of Portfolio Holdings, Proposed Rule*, 68 Fed. Reg. 70,402,

70,403 (Dec. 17, 2003). Potter should not be permitted to undermine this federal regulatory

structure by pursuing "fair value" claims under state law.

### C.      Potter's Claims Are Precluded By The Securities Litigation Uniform Standards Act

As the Janus defendants explained in opposition to Potter's motion to remand this case to

state court, SLUSA marks the second attempt by Congress to curb the filing of abusive,

hindsight-driven lawsuits relating to the purchase and sale of securities, whether in federal court

or in state court. If a state-law claim is governed by SLUSA, it must be dismissed. *Behlen v.*

*Merrill Lynch*, 311 F.3d 1087, 1092 (11th Cir. 2002) ("SLUSA preempts certain state law claims

. . . and requires immediate dismissal of covered lawsuits"). Because Potter's claims against the

Janus defendants are governed by SLUSA, they should be dismissed.

SLUSA controls if four conditions are met: the case must be (1) a "covered class action"

(2) alleging material misrepresentations, omissions, or fraud (3) "in connection with" the

purchase or sale of (4) a "covered security." 15 U.S.C. § 78bb(f)(1); *see Green v. Ameritrade,*

*Inc.*, 279 F.3d 590, 596 (8th Cir. 2002). In the remand briefing, Potter did not dispute that this case satisfies the first, second, and fourth of these requirements. His sole argument was that the "in connection with" requirement is not met because he purports to represent a class only of "holders," rather than purchasers or sellers, of securities. That argument is wrong for the reasons set forth in the Janus defendants' opposition to Potter's remand motion (at 4-15).

It is difficult to imagine allegations more squarely "in connection with" the purchase or sale of securities than Potter's claim that the Janus defendants' pricing policies allowed market timers to purchase and sell fund shares, allegedly to the detriment of the fund. Indeed, the Complaint centers on the *prospectus*—a document offered to prospective purchasers of securities. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). On its face, the Complaint thus meets the "in connection with" prerequisite to preemption under SLUSA. *See Feitelberg v. Merrill Lynch & Co., Inc.*, 234 F. Supp. 2d 1043, 1051-52 (N.D. Cal. 2002), *aff'd*, 2003 U.S. App. LEXIS 26266 (9th Cir. 2003).

Although the Supreme Court has ruled that mere "holders" may not maintain an action under Exchange Act Rule 10b-5 (*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)), the Court has deemed this prudential standing limitation inapplicable where the risk of frivolous litigation is not present. In *United States v. O'Hagan*, 521 U.S. 642 (1997), the Court rejected the contention that challenged conduct must have been directed at the person who ultimately bought or sold the securities, explaining that the *Blue Chip Stamp* limitation is "inapplicable" outside the context in which it arose. *Id.* at 664-65. The Supreme Court recently has reiterated that the "in connection with" requirement must be construed "not technically and restrictively, but flexibly in order to accomplish the remedial purposes" of the statutes in which that phrase is used. *SEC v. Zandford*, 535 U.S. 813, 822 (2002). Congress specifically enacted SLUSA to

prevent plaintiffs from evading federal pleading requirements by recasting their securities fraud allegations as state-law-based claims. *See Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 332 F.3d 116, 123 (2d Cir. 2003). The purposes of SLUSA would be thwarted if plaintiffs could so easily circumvent those requirements simply by purporting to bring their claims on behalf of "holders" even though the core allegations of the complaint involve alleged misrepresentations or omissions relating to the purchase or sale of securities. *See Falkowski v. Imation Corp.*, 309 F.3d 1123, 1131 (9th Cir. 2002) ("in connection with" requirement of SLUSA is satisfied if the alleged misrepresentation has more than a "tangential" relation to the securities transaction).

In any event, Potter has not stated a "holders" claim. The putative class includes *all* investors who, at any time over the course of the five-year class period, held shares in the Janus Overseas Fund for more than a mere *fourteen days. See* Compl. ¶ 41. It does not exclude those who may have purchased, exchanged, or redeemed shares during the class period. Courts have routinely held that SLUSA preempts lawsuits whose class definition, like Potter's, includes actual purchasers or sellers of stock. *See, e.g., Prof. Mgmt. Assocs., Inc. v. KPMG LLP*, 335 F.3d 800, 803 (8th Cir. 2003); *Cape Ann Investors LLC v. Lepone*, Civil No. 00-11531-RGS, 2003 U.S. Dist. LEXIS 22458, at *15 (D. Mass. Dec. 15, 2003); *Spehar v. Fuchs*, 02 Civ. 9352 (CM), 2003 U.S. Dist. LEXIS 10406, at *13-14 (S.D.N.Y. June 17, 2003); *Hardy v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 189 F. Supp. 14, 18 (S.D.N.Y. 2001). Potter's Complaint should similarly be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Respectfully submitted.

Dated:  February 2, 2004.

Gordon R. Broom - 00308447
Gary A. Meadows - 06209493
BURROUGHS, HEPLER, BROOM,
MACDONALD, HEBRANK & TRUE, LLP
103 West Vandalia St., Ste. 300
P. O. Box 510
Edwardsville, IL 62025
Telephone:  (618) 655-0184


Mark A. Perry
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Fax:  (202) 467-0539

*Attorneys for Janus Capital Management, LLC*



    //s// Kurt E. Reitz

Kurt E. Reitz
THOMPSON COBURN LLP
525 West Main Street
Belleville, Illinois 62220-1547
(618) 277-4700

Dale R. Harris
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202
(303) 892-9400

*Attorneys for Janus Investment Fund*

potter02021.doc

21